UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
……………………………………………………………X
PATRICIA SCOTT FLEMING, as Administratrix                         Civil  Case No. 1:18-cv-4866
of the Estate of Patrick Fleming,


                                        Plaintiff,                **SECOND AMENDED**
                                                                  **VERIFIED COMPLAINT**

        -against-

THE CITY OF NEW YORK,                                             **JURY TRIAL**
COMMISSIONER JOSEPH PONTE                                         **DEMANDED**
NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION,
CORIZON HEALTH, INC.,
PHYSICIAN AFFILIATE GROUP OF NEW YORK,
MAUNG MAUNGOO, M.D.,
MYAT WIN, M.D.,
ANTONIO MARTINEZ, M.D.,
NICOLE LANATRA, M.D.,
MARY LYNN NIERODZIK, M.D.,
ROOPALEKHA SHENOY, M.D.,
AARON STERN, M.D.,
JENNIFER WU, M.D.,
CAPTAIN DESMOND BLAKE,
CAPTAIN JOHANNE SAINT-FLEUR,
CORRECTIONAL OFFICER TIMOTHY OWENS,
CORRECTIONAL OFFICER REYES,
CORRECTIONAL OFFICER FRED ROLLE,
CORRECTIONAL OFFICER JOREL WARD,
CORRECTIONAL OFFICER DAVID WHITAKER,
CORRECTIONAL OFFICER CURLEE WILLIAMS,
CORRECTIONAL OFICER JOHN WISTI, and
JOHN DOES 1-38,

                                        Defendants.
……………………………………………………………X

        Plaintiff  Patricia  Scott  Fleming  as  administratrix   of  the  estate  of  Patrick  Fleming

("Plaintiff"  or  the  "Administratrix"),   by  and  through  her  attorneys,  Quainton  Law,  PLLC,  as  and

for  her  Verified  Complaint   against  Defendants  the  City  of  New  York,  New  York  City  Health  and

Hospitals  Corporation   ("HHC"),  Corizon  Health,  Inc.,  Maung  Maungoo,  M.D,  Myat  Win,  M.D.,

2264302.1

Dr. Antonio Martinez, Physician Affiliate Group of New York, Roopalekha Shenoy, M.D., Aaron Stern, M.D., Nicole Lanatra, M.D., Mary Lynn Nierodzick, M.D., Jennifer Wu, M.D., Captain Desmond Blake, Captain Johanne Saint-Fleur, Correctional Officer Timothy Owens, Correctional Officer Reyes, Correctional Officer Fred Rolle, Correctional Officer Jorel Ward, Correctional Officer David Whitaker, Correctional Officer Curlee Williams, Correctional Officer John Wisti, and John Does 1-38 (collectively, "Defendants"), alleges and states as follows:

## PRELIMINARY STATEMENT

1.     This is a case about the horrific abuse, unconscionable neglect and tragic death of Patrick Fleming ("Patrick"), a 28-year old, mentally-ill African-American man incarcerated for 5 years without a trial and on baseless charges at Rikers Island Correctional Center ("Rikers Island"). Patrick was subject to repeated brutal assaults under color of law resulting, among other things, in blows to his groin so intense his right testicle had to be removed.

2.     Patrick was then diagnosed with testicular cancer but continued to be abused, even to the extent of being placed in solitary confinement without access to appropriate mental health evaluation and treatment, proper food, or medical care, causing an aggravation of his cancer.

3.     As is often typical of the treatment of mentally-ill prisoners, Patrick was dismissed by medical personnel as a difficult patient who refused to cooperate when in reality he suffered from improperly treated mental illness that prevented him from providing informed consent during the course of his treatment. In addition, Patrick was administered excessive quantities of opioid medications that not only masked the seriousness his of medical condition but further prevented him from providing informed consent, while life-saving surgery was inexplicably delayed and never performed.

4.     Further, doctors ignored repeated warning signs and reports that Patrick was internally bleeding, failing to properly record and transmit crucial information and provide care

2

appropriate for a mentally ill pre-trial detainee incapable of understanding the nature of his illness or the treatment proposed.

5.      Despite his mental illness and life-threatening condition, Patrick continued to be subjected to the most horrific and degrading abuse on Rikers Island, including through excessive force at the hands of correctional officers, and the officers' deliberate indifference to his medical needs, notwithstanding their awareness of Patrick's condition and his need for treatment.

6.      It was only towards the end of his life – after an unconscionable five-year delay– that Patrick was permitted to plead to time served so he could seek potentially life-saving stem-cell therapy. However, Patrick continued to suffer from medical neglect in the prisoners' unit at Elmhurst Hospital where he suffered for nine days during which his massive internal bleeding went undiagnosed and untreated.

7.      By the time Patrick's condition was diagnosed, and a blood transfusion administered, it was too late: Patrick's vital organs had already collapsed under the pressure of the undiagnosed internal bleeding, cutting short a life already deprived of basic constitutional safeguards and condemned to half a decade of incarceration—all for a crime for which Patrick was never tried and for which he had maintained his innocence.

8.      This case is being brought by Patrick's mother, Patricia Scott Fleming, as the administratrix of Patrick's estate for:

- Violation of Patrick's Fourth, and Fourteenth Amendment rights under color of law pursuant to 42 U.S.C. § 1983;

- Violation of Patrick's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.;

- Violation of Patrick's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a);

3

- Violation of Patrick's constitutional rights as part of a pattern and practice of officially sanctioned conduct under *Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 701 (1978);

- Assault and vicarious liability for assault;

- Negligence, including through the prescription and administration of excessive quantities of harmful and highly addictive opioid medication, without appropriate warnings;

- Wrongful death; and

- Medical malpractice.

## **PARTIES**

9.      Patricia Fleming is an African-American woman who lost her only child, Patrick Fleming, as a result of the events set forth in more detail in this Verified Complaint.   At all times relevant herein, Ms. Fleming resided in the New York County, at 236 W. 64th Street, Apt. 6A, New York, NY 10023. Patrick Fleming died on June 20, 2017.

10.      Ms. Fleming was duly granted Letters of Limited Administration on October 4, 2017 by the Honorable Nora S. Anderson, Judge of the New York County Surrogate's Court, State of New York.  A copy of the Letters of Administration is attached hereto as Exhibit A. At all times relevant herein Ms. Fleming resided in the New York County, at 236 W. 64th Street, Apt. 6A, New York, NY 10023.

11.      The City of New York is a municipal corporation organized under the laws of the State of New York. The City of New York delegates to the New York City Health and Hospitals Corporation the responsibility to contract an organization providing healthcare to prisoners in correctional facilities of the City of New York.  At all relevant times herein, the City of New York

4

was responsible for the policies governing such responsibilities of the New York City Health and Hospitals Corporation and for the misconduct, acts, and omission of its agencies, including the New York City Health and Hospitals Corporation.

12.     Joseph Ponte, a New York City Department of Corrections Commissioner chosen and appointed by the Mayor of the New York City ("Commissioner Ponte"). Commissioner Ponte had to step down from his position in or about June 2017 amid a swirl of revelations about mismanagement and dysfunction at the highest levels of New York City's jail agency. Commissioner Ponte is sued in his individual capacity and in his official capacity because he is a government official whose edicts and acts represent the official policy, practices, customs and regulations of the DOC, and it is those polices, practices, customs and regulations which violated Plaintiffs' constitutional rights and contributed to Plaintiffs' injuries.

13.     The New York City Health and Hospitals Corporation aka NYC Health + Hospitals ("HHC") is a public benefit corporation created by the City of New York in 1969 to operate city hospitals and other health care facilities.

14.     The New York Department of Corrections operates several specialized housing units for prisoners with mental health issues, including the Clinical Alternatives to Punitive Segregation Program (CAPS) and the Program to Accelerate Clinical Effectiveness (PACE). CAPS offers an alternative to punitive segregation for prisoners with serious mental illness, PACE is a therapeutic housing program that offers additional counselling and programming for mentally ill prisoners who would benefit from the services. https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/2017/July-11-2017/DOC-Report-on-Punitive-Segregation-Reforms-6-27-17.pdf.   Based on data and concerns from advocates and other policy makers, DOC designed and implemented an alternative to solitary confinement for

persons with serious mental illness who received infractions for violating jail rules, which came to be called the Clinical Alternative to Punitive Segregation (CAPS) unit. *Id.*

15.     Corizon Health, Inc. ("Corizon"), formed by a 2011 merger of Correctional Medical Services, Inc. and Prison Health Services, Inc., is a privately held prison healthcare contractor that provided healthcare and pharmaceuticals to prisoners at Rikers Island pursuant to a contract with HHC. After Corizon was accused by state investigators for medical failures that played a role in up to a dozen deaths at Rikers – which were widely covered in the news – the City of New York discontinued its relationship with Corizon as of January 2016. Corizon's corporate address is 103 Powell Court Brentwood, TN 37027.

16.     Physician Affiliate Group of New York, PC ("Pagny") was contracted by HHC to provide medical and mental health services to patients in New York City's correctional facilities on January 1, 2016. Pagny's principal place of business is at 55 W 125th St., Suite 1001, New York, NY 10027.

17.     Dr. Maung Maungoo is a doctor at Rikers Island under a contract administered by Corizon and/or Pagny. Dr. Maungoo was deliberately indifferent to Patrick's serious medical needs.

18.     Dr. Myat Win is a doctor at Rikers Island under a contract administered by Corizon and/or Pagny. Dr. Win was deliberately indifferent to Patrick's serious medical needs.

19.     Dr. Antonio Martinez is a doctor at Rikers Island under a contract administered by Corizon and/or Pagny.

20.     Dr. Roopalekha Shenoy is a doctor practicing at and under the control of Elmhurst Hospital who provided medical care to Patrick.

21.     Dr. Aaron Stern was the supervising doctor overseeing Patrick's medical care at Elmhurst Hospital.

22.    Dr. Jennifer Wu is a doctor practicing at and under the control of Bellevue Hospital who provided medical care to Patrick.

23.    Dr. Nicole Lanatra is a doctor practicing at and under the control of Bellevue Hospital who provided medical care to Patrick.

24.    Dr. Mary Lynn Nierodzik is a doctor practicing at and under the control of Bellevue Hospital who provided medical care to Patrick.

25.    Captain Desmond Blake is former Rikers Island correctional officer captain responsible for brutal acts of violence under color of law against Patrick, currently assigned to Queens County Criminal Court.

26.    Captain Joanne Saint-Fleur is a Rikers Island correctional officer captain responsible for brutal acts of violence under color of law against Patrick.

27.    Correctional Officer Timothy Owens is a Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

28.    Correctional Officer Timothy Owens is a Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

29.    Correctional Officer Reyes is a Rikers Island correctional officer responsible for failing to provide an accommodation for Patrick's mental and physical disability.

30.    Correctional Officer Fred Rolle is a Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

31.    Correctional Officer Jorel Ward is a Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

32.    Correctional Officer David Whitaker is retired Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

2264302.1

33.     Correctional Officer Curlee Williams  is a retired Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.  Mr. Williams' most recent address is currently unknown and is under investigation  by Plaintiff.

34.     Correctional Officer John Wisti is a Rikers Island correctional officer responsible for brutal acts of violence under color of law against Patrick.

35.     John Does 1-38 are fictitious  names for individuals  intended to be current and former colleagues, employees, agents, contractors, officers, correctional officers, prisoners, medical personnel, doctors or nurses of above mentioned Defendants or other entities found during this litigation  to have a relation to the above-captioned matter.  Discovery may reveal that certain John Does overlap with Defendants identified  by name herein.

## JURISDICTION AND VENUE

36.     This action is brought  under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, Section 504 of the Rehabilitation  Act of 1973, 29 U.S.C. § 794(a), Title II of the Americans with Disabilities  Act, 42 U.S.C. § 12131, et seq., and New York State statutory and common law.

37.     This Court has subject matter jurisdiction  under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs  seek compensatory and punitive  damages for the deprivation  under color of state law of certain rights of a citizen  of the United  States secured by the United  States Constitution  and federal law pursuant to 42 U.S.C. § 1983.

38.     This Court has supplemental jurisdiction  over claims brought  under New York Law pursuant to 28 U.S.C. § 1367.

39.     On November 3, 2016, a statutory Notice of Claim  was served upon the Comptroller's  Office of the City of New York and N.Y.C. Health and Hospitals  Corporation.

8

40.    On September 12, 2017, a statutory Notice of Claim was served upon the Comptroller's Office of the City of New York and N.Y.C. Health and Hospitals Corporation.

41.    On September 15, 2017, a statutory Property Damage or Loss Claim Form was served on the Comptroller's Office of the City of New York.

42.    Since the service of three aforementioned Notices of Claim, more than 30 days have elapsed and Defendants have neglected or refused to make any adjustment or payment thereof.

43.    Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred in this judicial district.

## EXHAUSTION

44.    The exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. 1997e(a), is not applicable to an action commenced after a prisoner's release from custody.

45.    On information and belief, Patrick exhausted those remedies that were capable of use and available to Patrick at the time he was confined.

## FACTUAL ALLEGATIONS

**Background**

46.    Ms. Fleming's son, Patrick Fleming – Ms. Fleming's only child – was born on September 17, 1988 and was only 28 years old when he died under the circumstances set forth herein.

47.    Patrick graduated from Landmark High School in 2005. He attended Borough of Manhattan Community College for one year, after which he immediately began working.

9

2264302.1

48.    From 2006 – 2011, Patrick's mother and grandmother were recovering from cancer. Patrick provided substantial assistance both to his grandmother and his mother during this period, while also maintaining a part-time day job as a doorman at a luxury apartment building located at 429 Greenwich Village Street and full-time as an overnight doorman at 50 Gramercy Park North.

**2011 and 2102 Arrests and Transfer to Riker's Island**

49.    On April 14, 2011, Patrick was arrested for an alleged armed robbery.

50.    On October 19, 2012, while he was out on bail, Patrick was involved in a car accident.

51.    Following the accident, Patrick was arrested and arraigned on various charges, including reckless driving and reckless endangerment.

52.    Bail was set at $600,000, which neither Patrick nor his family were able to pay, and Patrick was not released.

53.    In October 2012, Patrick was transferred to Rikers Island.

54.    For the next five years, Patrick's trial was repeatedly delayed, until he was finally released days before his death, never having faced trial on the charges against him

55.    For nearly three years, Patrick languished on Rikers Island, with adjournment after adjournment of his trial on both the original car robbery charge and the subsequent reckless endangerment charge following the October 2012 car accident. The government made several plea offers that were rejected because Patrick was innocent and maintained his innocence of the charges against him.

56.    While in custody, Patrick was exposed to gangs that, on information and belief, operate inside Rikers Island. On information and belief, some DOC uniformed staff have been known to have ties with gangs, while others turn a blind eye to the activities of gangs who

10

routinely intimidate, bully and abuse other prisoners. On information and belief, the DOC has a custom and practice of using gangs to serve as de facto DOC auxiliaries.

57.   On information and belief, the DOC and its correctional officers developed an animus against Patrick that resulted from his refusal to accept the authority of their gang auxiliaries. In addition, on information and belief, the DOC and its correctional officers developed hostility to Patrick because of his unwillingness to accept the "rap" for the attempted robbery of which he maintained his innocence, and because of his resolute opposition to attempts to extort him for money, clothes, food, and anything else of value to Patrick.

58.   On information and belief, the DOC has a custom and practice of using and/or condoning excessive physical force and brutality against prisoners who are perceived as uncooperative or who do not, or are perceived not to, accept the authority of the DOC officials and/or their gang auxiliaries.

59.   On February 5, 2015, all charges against Patrick relating to the October 2012 car accident were dismissed.

60.   On or about April 21, 2015, while on Rikers Island, three gang members violently assaulted Patrick. Thereafter, the court ordered Patrick into protective custody. On information and belief, the gang members assaulted Patrick while under the observation of DOC officers John Does 1-3 who instigated, condoned, and turned a blind eye to the assault.

61.   In May 2015, Patrick's attorney convinced Patrick to plead guilty to the alleged armed robbery in 2011 and accept a 9-year prison term. On information and belief, at the time of his plea, Patrick had been diagnosed as suffering from a major depressive disorder and was under the influence of anti-depressant and anti-psychotic drugs, including Vistaril (prescribed for anxiety, and Remeron (prescribed for major depressive disorder). As a result, at the time he entered his guilty plea, Patrick was unable to think clearly.

11

62.     On information and belief, following his plea bargain, Patrick began telling fellow prisoners that he would challenge his plea at sentencing.

63.     On June 8, 2015, Patrick was brought back to court for sentencing. However, Patrick never made it into the courtroom.

64.     On information and belief, the DOC knew or should have known Patrick suffered from mental illness and a seizure disorder, and had a protective custody classification that needed to be communicated to court officials so his disability would be accommodated and he would be protected from physical injury. Nevertheless, on information and belief, the DOC failed to communicate his custody statute and need for an accommodation to court officials thus recklessly and needlessly exposing Patrick to the risk of physical injury and depriving him of an accommodation for his disability.

65.     As a result of the DOC's reckless conduct, when Patrick arrived at the courthouse, he was taken to a general population-holding pen. Patrick objected when Correctional Officer Curlee Williams, badge number 3685 ("Officer Williams"), ordered Patrick to enter the general population holding pen. Patrick informed Officer Williams that due to his protective custody status, Patrick should not be held in the general population holding pen. On information and belief, officer Williams recklessly failed to investigate Patrick's housing status and instead responded by saying: "Get the fuck in the pen." Before Patrick could even react, Officer Williams, joined by other officers, John Does 1-6 (who may overlap with correctional officers involved in separate incidents of excessive force described below), pushed Patrick to the ground. The correctional officers repeatedly assaulted Patrick by kicking and punching him in the face, causing his head to violently hit the floor several times. This assault is referred to hereafter as the "June 8 Assault." While he was still under the shock of this assault, Patrick told Plaintiff that he distinctly remembered a captain coming and kicking him directly in the face. Patrick also told his

12

mother that notwithstanding his pleas for them to stop, the correctional officers gathered around him in a circle and assaulted him for about four minutes until he lost consciousness.

66.     When Patrick regained consciousness, his clothing was covered with blood, he had bruises and cuts on his face and body, pain in his teeth and lips, and significant pain in his neck and back.

67.     Patrick was put in a wheelchair and taken to Bellevue Hospital where he was diagnosed as suffering from a herniated disk, abrasions to his face, abdominal pain, and hematoma to his forehead.   Hospital records show that he suffered from a seizure disorder and psychiatric issues. At the time of his admission was taking the medications Remeron, Dilantin, and Vistaril.

68.     By letter dated June 15, 2015, the Legal Aid Society wrote to Michael Blake, the New York City Department of Correction Deputy Commissioner for Integrity requesting an investigation into the courthouse assault on Patrick. In an email transmitting that letter, the Legal Aid Society attached letters alleging DOC misconduct on behalf of two other inmates, James Thomas and Alphonso Harris. Copies of the email were sent to nine officials in the Department of Corrections, three officials in the New York City Department of Investigations, and five officials at the New York City Board of Corrections.

### Escalation of Violence Against Patrick on Rikers Island

69.     Thereafter, Patrick was referred to the clinic at the North Infirmary (the "NIC"), a jail facility under the control of HHC located on Rikers Island, where, on information and belief, his mental health needs were not addressed.

70.     After he partially recovered from the June 8 Assault, in July 2015, the court granted Patrick's motion to withdraw his wrongly entered plea.

71.     July 6, 2015, the Legal Aid Society notified officials at HHC and the Board of Corrections, as well as Jay Cowan at Corizon and Carl J. Keldie, Chief Medical Office of Prison

Health Services, that plaintiff had reported that Patrick had been hearing voices at night telling him to hurt himself but had not received mental health services. Legal Aid requested a mental health evaluation for Patrick.

72.     On or about the first week of August 2015, Patrick told his mother that he was being transferred to the Anna M. Kross Center (the "AMKC"), a jail complex on Rikers Island. Patrick also informed his mother that he had brought to the attention of DOC staff members John Does 7-8 that he had been placed in protective custody because he had been assaulted by members of gang and was not meant to be placed in general prison population at places like the AMKC facility. On information and belief, Patrick also brought to the attention of DOC staff members John Does 9-10 that he was not meant to be placed in the AMKC facility because of his previous assault by gang members who continued to abuse him notwithstanding the court's order that he be placed in protective custody.

73.     On information and belief, the DOC and John Does 7-10 knew Patrick suffered from mental illness and he needed housing accommodations appropriate to his mental condition, and further knew that housing Patrick in general population at AMKC facility exposed Patrick to the risk of serious physical injury from gang assault. Nevertheless, the DOC and John Does 7-10 refused to accommodate Patrick's disability and refused to honor his custody status and in reckless disregard for his safety proceeded to house him in the AMKC general population.

74.     In early August 2015, Patrick was examined at Elmhurst following complaints of chest pain.

75.     On August 16, 2015, on his return from Elmhurst, Patrick was sent to the AMKC clinic for a follow-up after he continued to report troubling symptoms. Patrick was examined by medical staff. The medical staff did not note any injuries or head or ear wounds, or any sign of trauma, including to Patrick's genitals.

14

76.    On information and belief, shortly after the examination discussed above, Patrick was placed in mental health pen 4 on the new admission side of the AMKC clinic.  While there he complained to DOC Captain Desmond Blake that he was being threatened by gangs in the AMKC facility and asked that he not be housed with gang members in that facility.  Patrick made this complaint and request while Captain Blake was conducting a preventive search of the AMKC facility with Captain Johanne Saint-Fleur, Correctional Officers Timothy Owens, Fred Rolle, Jorel Ward, John Wisti and David Whitaker.

77.    On information and belief, Blake, Saint-Fleur, Owens, Rolle, Ward, Wisti and Whitaker knew or should have known that Patrick suffered from mental illness and a seizure disorder, knew that Patrick's mental illness frequently prevented him from responding rationally, and knew that he needed housing accommodations appropriate to his medical condition., Despite this knowledge, Captain Blake rejected Patrick's request that he not be housed in the AMKC facility, telling Patrick he would be "smacked around" if he complained again.

78.    Blake, Saint-Fleur, Owens, Rolle, Ward, Wisti and Whitaker ignored the need to accommodate Patrick's mental illness and failed in their duty to protect Patrick from a known risk of violence at the hands of gangs and other prisoners.

79.    Patrick became frightened, started panicking, and in despair and fear unconsciously removed all his clothing in protest.  Instead of contacting mental health staff, Captain Blake responded by physically assaulting Patrick.  Captain Blake pushed Patrick to the ground, grabbed his head and bent it over the toilet bowl in Patrick's holding pen, trying to force Patrick's head into the toilet.  Patrick struggled to get away and rolled over on the floor.  Captain Blake punched Patrick in the head and kicked him in his upper body, causing Patrick to fall on his back.  Captain Blake then stomped on Patrick's groin three times and continued punching and kicking Patrick. Saint-Fleur, Owens, Rolle, Ward, Wisti and David Whitaker observed the violent assault, knew

that the force being applied was excessive, and instead of taking action to stop the assault and protect Patrick from further abuse, callously and recklessly ignored the assault, demonstrating the degree to which excessive force and extreme brutality on the part of the correctional officers is condoned and has become an accepted and routinized practice on Rikers Island. This incident is referred to hereafter as the "August 16 Assault."

80.    Immediately after the August 16 Assault, Patrick was taken to AMKC clinic and examined by Dr. Park. On information and belief, Dr. Park failed to examine Patrick thoroughly, failed to document Patrick's injuries in Patrick's medical record, and failed to report the assault to the DOC's internal affairs division so that Patrick's injuries could be photographed as part of the internal affairs investigation into the use of force.

81.    Shortly after being seen at the AMKC clinic, Patrick was taken first to Elmhurst Hospital, then to Bellevue Hospital. The medical records from examination at Elmhurst/Bellevue immediately after the August 16 Assault show that Patrick suffered from a hematoma to the right side of the forehead, bruises to his face and arms, and positive dry blood in his right ear, a clear indication of head trauma. He also suffered from bruises to the right shoulder and right arm and was placed in a C-collar due to neck pain with neck tenderness. Bellevue Hospital records further confirmed that Patrick had sustained a ruptured testicle due to trauma in the groin area.

82.    As a result of the severity of his injuries, Patrick's right testicle had to be removed during emergency surgery. Before Patrick was taken into surgery, Plaintiff managed to see her son while he was still lying on a gurney. Patrick told his mother that he had been attacked and beaten and that his testicle had been stomped on. Just before the surgery, Patrick showed his mother the horrible sight of his beaten and ruptured testicle.

83.     By letter dated August 25, 2015, the Legal Aid Society wrote to Michael Blake, the New York City Department of Correction Deputy Commissioner for Integrity requesting an investigation into the brutal beating of Patrick in the AMKC mental health pen.

84.     In an email dated August 26, 2015 transmitting the letter regarding Patrick, the Legal Aid Society attached letters alleging DOC misconduct on behalf of four other inmates, Daniel Freeman, Romario Burke, Evan Huss, and Patrick Hoover.  Copies of the email were sent to nine officials in the Department of Corrections, three officials in the New York City Department of Investigations, and four officials at the New York City Board of Corrections.

85.     A subsequent investigation of the August 16 Assault exonerated all the correctional officers allegedly involved in the incident, notwithstanding the facts set forth above, illustrating the systematic and institutionalized nature of correctional officers' use of excessive force, violence and brutal treatment of prisoners in the custody and care of the DOC and the City of New York.

**Patrick Diagnosed with Testicular Cancer**

86.     During the surgery to remove Patrick's right testicle, samples of tissue were taken, and Patrick was diagnosed with testicular cancer on August 17, 2015.  Hospital records indicate that accurate initial staging of his cancer was hampered by traumatic bleeding.  In addition, on August 24, 2015, Patrick told his mother that he had been diagnosed with Hepatitis B.

87.     Following the testicular surgery and as a result of the assault, Patrick suffered extreme mental and emotional distress. When an attempt was made to move him back to AMKC, he became upset and refused to be transferred and was placed in a psychiatric unit at Bellevue Hospital.  He was eventually discharged with a directive, written in all caps, that he "must be on suicidal [sic] watch at Rikers."

88.     On discharge, Patrick was prescribed hydromorphone (an opioid), Prozac (an anti-depressant), Risperidone (an anti-psychotic medication used to treat schizophrenia and bi-polar disorders), Trazadone (an anti-depressant) and Carbamazepine (an anti-epileptic).

89.     After his discharge from Bellevue, Patrick was assigned to the Brooklyn Detention Center (BKDC) jail, and then was moved to Vernan Bain Correctional Center (VBCC) and then was transferred to the Rikers North Infirmary Compound (NIC), where he remained until April 2016.

90.     During visiting hours after the surgery, while the effects of the violence Patrick had been subjected to were still fresh in his mind, Patrick called Plaintiff and told her in detail what had transpired. Plaintiff was also able to obtain the assistance of the Prisoner's Rights Project of the Legal Aid Society (the "Legal Aid Society"), which formally requested that DOC to preserve any photographic or video evidence relating directly or indirectly to the August 16 Assault.

91.     On information and belief, Dr. Martinez knew that Patrick and been diagnosed with Hepatitis B, knew that Hepatitis B was a serious medical condition, and knew that Hepatitis B was a readily treatable condition. Nevertheless, on information and belief, Dr. Martinez recklessly refused to provide Patrick treatment for his Hepatitis B.

92.     In or about December 2015, Patrick noticed blood in his stool. Patrick communicated this alarming observation to his mother shortly after he noticed the blood in his stool. Patrick told his mother about the blood, and he also told Dr. Martinez about it. Although Dr. Martinez knew that internal bleeding could cause bloody stools and knew that testing should be performed to determine the cause, he recklessly and callously failed to conduct any testing or diagnostic evaluation to determine the cause of the bleeding.

93.     On information and belief, between August and October 2015, Patrick's name appeared on the call sheet several times for medical appointments, including scheduled oncology

18

appointments at Bellevue Hospital and Elmhurst Hospital. On information and belief, correctional officers on Patrick's unit, John Does 11-12, knew that Patrick's name appeared on the call sheets for scheduled outpatient medical appointments, and yet purposely and recklessly refused to notify Patrick of and/or allow him to report to the scheduled medical appointments.

94.    On information and belief, during this same period of time, Patrick was scheduled for outpatient trips to see his oncologist, and failed to report for his appointments as a result of interference by John Does 11-12 with Patrick's medically prescribed treatment.

95.    Patrick went through two cycles of chemotherapy in October and November 2015.

96.    During his treatment at Bellevue in late 2015, Patrick was seen in the Neurology Clinic for follow-up of a previous diagnosis of spastic quadriparesis and was found to have multi-level degenerative changes in his cervical spine. On information and belief, Patrick never received appropriate treatment or this condition.

97.    On or about January 4, 2016, Patrick was scheduled to begin his third cycle of chemotherapy.  On information and belief, Patrick's name appeared on the call sheet for his outpatient medical appointment.  On information and belief, correctional officers on Patrick's unit, John Does 11-12, knew that Patrick's name was on the call sheet for a scheduled outpatient medical appointment and yet purposely and recklessly refused to notify Patrick of and/or allow him to report to the scheduled medical appointment.

98.    On information and belief, was scheduled for chemotherapy on January 4, 2016 and failed to report for his appointment as a result of the interference by John Does 11-12 with Patrick's medically prescribed treatment.

99.    As a result of the foregoing, Patrick missed his scheduled chemotherapy appointment on January 4, 2016, which had to be rescheduled to January 7, 2016.

19

100.   On information and belief, Rikers Island correctional officers regularly ignore and refuse to notify prisoners of and/or allow them to report to scheduled medical appointments.

101.   On information and belief, on multiple occasions between January 7, 2016 and January 30, 2016, Patrick's treatment was unnecessarily and unconscionably delayed by correctional officers on Patrick's unit, John Does 11-12, who again purposely and recklessly refused to notify Patrick of and/or allow him to report to the scheduled medical appointments

102.   Patrick was scheduled for appointments to treat his cancer on multiple occasions between January 7, 2016 and January 30 2016, and failed to report for his appointments as a result of the interference by John Does 11-12 with Patrick's medically prescribed treatment.

103.   On January 30, 2016, Patrick was taken to Bellevue Hospital for an evaluation. On information and belief, Patrick again reported blood in his stool to Dr. Jennifer Wu and/or Dr. Nicole Lanatra and/or Dr. Mary Lynn Nierodzik. On information and belief, Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik reviewed the reports of blood in Patrick's stool that had been previously made, and were aware that the bloody stools were a sign of internal bleeding, and yet Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik failed to perform diagnostic tests to determine the source or cause of the internal bleeding reported by Patrick.

104.   Following the January 30, 2016 evaluation, Patrick completed his third cycle of chemotherapy which was unnecessarily and unconscionably delayed as a result of the ongoing interference by correctional officers John Does 11-12.

105.   On information and belief, during this time, Patrick's mental and physical health deteriorated to the point where he could not rationally understand the need for his cancer treatment, comply with the treatment or give informed consent without appropriate intervention by mental health professionals.

2264302.1

106.   On information and belief, as a result of his diminished mental capacity and physical infirmities, Patrick refused his fifth cycle of chemotherapy on more than one occasion.   On information and belief, Dr. Martinez and the Bellevue medical staff, including Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik, knew or should have known that Patrick's refusal of treatment was the product of an irrational fear produced by his declining mental and physical condition, and further knew that Patrick was in need of psychiatric treatment, and failed to provide Patrick with appropriate psychiatric treatment and/or medication and repeatedly failed to perform adequate psychiatric evaluations to ensure that Patrick gave informed consent when he was discharged without completing the full treatment protocol.

**Patrick's Dietary Needs Systematically Ignored**

107.   Cancer patients typically require particular care in their diet, as chemotherapy weakens the body, renders it susceptible to disease, and carries such side effects as nausea and vomiting that make it difficult for the patient to tolerate food and maintain weight. *See* National Cancer Institute, Nutrition in Cancer Care, https://www.cancer.gov/about-cancer/treatment/side-effects/appetite-loss/nutrition-hp-pdq#_5   A nutritionally inadequate diet can interfere with the patient's ability to tolerate chermotherapy and undermine treatment.   *See* American Cancer Society, Nutrition for People With Cancer, https://www.cancer.org/content/dam/CRC/PDF/Public/6711.00.pdf

108.   Discharge summaries and instructions were sent to Rikers by Bellevue and/or Elmhurst after Patrick's chemotherapy treatments advising that Patrick's diet needed to be closely monitored to ensure that his nutritional needs were met.   HHC, Corizon, Pagny and the Rikers Medical defendants were or should have been aware that during his cycles of chemotherapy Patrick experienced bouts of vomiting and nausea that made it particularly difficult for him to tolerate the treatment and to maintain his weight.

21

109.  Beginning in December 2015 and over the course of his treatment, HHC personnel, including defendants Maungoo, Win, and Martinez, by virtue of Patrick's discharge summaries and instructions for care, if not their own observations, knew or should have known the following: that Patrick was severely malnourished and required a flexible diet that he could tolerate; that Patrick could not gain weight; that he required nutritional consultation and support; that Bellevue doctors recommended that Rikers provide him with a high calorie diet supplemented by foods he could tolerate, including peanut butter and jelly and cereal, and liquid protein; and that he should have adequate oral hydration at all times.

110.  During this same period, Plaintiff and staff at the Legal Aid Society sent numerous letters and emails to HHC Chief Medical Officer Venter and other HHC doctors and to DOC personnel referencing the dietary and other requirements recommended by Bellevue/Elmhurst and stressing the urgency of providing Patrick with food he could tolerate, adequate hydration, and that he be placed in appropriate medical housing.  Proper nutrition was critical to Patrick's ability to maintain his strength and to tolerate the chemotherapy he needed to battle his cancer. Yet, despite clear knowledge that Patrick was increasingly and dangerously malnourished, DOC, HHC, and defendants PAGNY, Maungoo, Win, and Martinez failed to prescribe foods he could tolerate or otherwise ensure that Patrick's dietary needs were met.

111.  This failure reflects a systematic pattern by which Rikers detainees are routinely denied foods they can tolerate even when they are wasting away because they cannot tolerate the regular prison diet. In contrast, private chemotherapy patients with special dietary needs and restrictions are prescribed diets tailored to their medical needs, but such medical diets are deliberately denied to prisoners.

112.  As a result of the failure to accommodate Patrick's nutritional needs, Patrick became dangerously underweight.  By the end of October 2016 Patrick, who was 6' 2" with an

ideal body weight of 196 pounds, weighed only 118 pounds and had a body mass index (BMI) of 15.1

113.  Moreover, in addition to his dietary needs during cancer treatment, Patrick suffered from well-known allergy and dietary restrictions of which HHC and DOC staff were or should have been aware.  Among other things, Patrick's medical records show he was lactose intolerant Yet, the principal liquid provided to prisoners with meals was full-fat whole milk,. which Patrick could not digest.

114.  The tap water in cells at Rikers is known to be rusty and dangerous.  See Rakia, Ravin, A Sinking Jail: The Environmental Disaster That is Rikers Island," https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/  ("Ground settlement also causes problems with the water supply.  The water pipes are located underground, and as the ground shifts the pipes can move, crack, or break apart.").  See Waters, Michael, How Prisons Are Poisoning Their Inmates,  https://theoutline.com/post/5410/toxic-prisons-fayette-tacoma-contaminated?zd=1&zi=45wibf66  ("At Rikers Island in New York, which was built on a toxic-waste landfill, inmates have reported coughing up blood and guards have developed cancer.").

115.  The only alternative to the milk provided with meals and Riker's rusty tap water was bottled water from the prison commissary, but this water was only available in limited and insufficient quantities.

116.  Patrick on at least one occasion reported to the Legal Aid Society that the water in his cell was so brown and discolored that it was not potable and that he feared he would run out of bottled water before he could purchase more.

117.  Notwithstanding Patrick's allergies, dietary needs as a cancer patient, and dietary restrictions, – of which Rikers Island medical personnel were well-aware, Drs. Maungo, Win and

Martinez all failed to prescribe appropriate nutritional and adequate liquids Patrick's body could tolerate, thereby contributing directly to the failure of Patrick's chemotherapy treatment.

**Patrick Placed in Solitary Confinement and Cancer Progresses**

118.   On information and belief, following his return to Rikers Island from Bellevue, Patrick exhibited behaviors and traits that clearly called for a mental health referral. Patrick on one occasion refused to be examined by Dr. Nierodzik because she reminded him of his mother. Then, on or about April 10, 2016, Patrick was involved in a knife fight with another prisoner—a red flag as to Patrick's mental state when he was known to have stripped naked in front officer. On information and belief, though correctional officers on Patrick's unit, John Does 11-12, knew that Patrick's behaviors required mental health intervention, they recklessly and with deliberate indifference to Patrick's medical needs failed to follow the DOC protocol for making a referral to Mental Health Services.

119.   On information and belief, despite evidence that the altercation resulted from Patrick's deteriorating mental state, correctional officers John Does 13-14 recklessly and with deliberate indifference to Patrick's medical needs failed to initiate the DOC's policy for making a mental health referral for detainees awaiting disciplinary action. Instead, the officers placed Patrick in a solitary confinement cell for 30 days, where he was denied appropriate access to mental health treatment, water, nutrition, hygiene and access to medical personnel.

120.   This placement in solitary confinement came at a time when HHC medical staff and DOC staff knew or should have known that Patrick was dangerously underweight and debilitated and in urgent need of adequate nutrition and hydration.  Yet, because Patrick was unable to tolerate prison milk, could not tolerate the tap water, and had insufficient access to bottled water from the Commissary, Patrick was kept severely and dangerously dehydrated in the solitary confinement cell known as the "oven" even by those whose hydration needs were being met.

24

121.   In accordance with DOC policy,  medical personnel at the NIC were required to evaluate Patrick within 24 hours of his placement in solitary confinement. On information  and belief, no such evaluation occurred, despite the knowledge of medical staff that Patrick was a cancer patient in need of ongoing  medical and mental health treatment, and further knew that his placement in solitary  confinement, rather than the mental health unit,  would interfere with his medical treatment.

122.   Rather, a perfunctory chart review without a live patient assessment was performed, indicating  Patrick's suitability  for only for 23-hour lockdown cell housing. Dr. Martinez and/or John Does 15-16 recklessly and with deliberate indifference to Patrick's medical needs failed to initiate the DOC's policy  for making an appropriate  mental health referral for detainees awaiting disciplinary  action.

123.   Patrick was then placed in solitary  confinement  for 30 days where he was denied appropriate  access to mental health  treatment, medical  treatment, as well as access to water, nutrition,  and hygiene.

124.   During  early stages of cancer, the strength of a patient's immune  system is critical to his ability  to fight the progression of the disease. By deliberately  placing an already severely weakened  mentally   ill  cancer  patient  in  the  medically  dangerous  conditions  of  solitary confinement,  the DOC, and John Does 13-16 knowingly  and recklessly and with  deliberate indifference  to Patrick's medical  needs disregarded a serious  risk to Patrick's life out of all proportion  to any possible  disciplinary  infraction that Patrick may or may not have committed.

125.   On or about May 22, 2016, after being released  from solitary confinement, Patrick was transferred to West Facility,  a jail facility  on Rikers Island, and placed in a cell by himself because of his extreme and debilitating  physical and mental illnesses.

**Patrick's Complaints of Abdominal  Pain and Internal Bleeding Ignored**

126.   In or about the beginning of June 2016, Patrick repeatedly complained to his mother about excruciating abdominal pain and blood in his stool.  Patrick reported these same symptoms to Dr. Maungoo and/or Dr. Win.  Dr. Maungoo and/or Dr. Win knew that Patrick had previously complained of bloody stools and that his added complaint of abdominal pain, combined with new reports of blood in his stools, were signs of a life-threatening condition.  Dr. Maungoo and/or Dr. Win further knew that testing was needed to determine the cause of the pain and bloody stools, and yet Dr. Maungoo and/or Dr. Win recklessly and with deliberate indifference to Patrick's medical needs failed to conduct appropriate testing to determine the cause of the bleeding, and further failed to make a referral so that Patrick's condition could be appropriately diagnosed and treated by a qualified outpatient medical provider.

127.   Instead, Dr. Maungoo and/or Dr. Win failed to investigate Patrick's medical complaints and, beginning in June 2016 extending to May 2017, routinely prescribed opioids to treat Patrick's pain without proper warnings as to the dangerous and addictive effects of such medication, and in disregard of the risk of furthering his addiction to narcotics .

**Systematic Failures to Take Patrick to Medically Necessary Appointments and Treatment Sessions**

128.   Rikers Island correctional officers are notorious for failing to take prisoners to scheduled medical appointment.   https://nypost.com/2019/06/29/rikers-island-inmates-are-increasingly-missing-doctor-visits-report/.

129.   Patrick suffered from this practice and frequently missed medical appointment and chemotherapy treatment sessions because Rikers Island correctional officers failed to take him to the appropriate outside hospital.  On at least the following occasions, Rikers Correctional Officers failed to take Patrick to his scheduled medical appointments:

- On March 8, 2016 Patrick was told that he had missed the bus for a chemotherapy test, when in fact the Rikers' Correctional Officers had failed to pick him up for his scheduled appointment.

- On March 15, 2016 Rikers' Correctional Officers again failed to take Patrick to a scheduled appointment.

- On May 29, 2016 Patrick was told there was no room on the bus transporting prisoners to outside medical facilities and missed his scheduled medical appointment.

- On May 30, 2016 Patrick was told he had not gotten ready in time for the transportation bus and missed his scheduled chemotherapy session; in fact, Patrick had been ready on time, but the Correctional Officers failed to pick him up as as scheduled.

- On August 18, 2016, the Legal Aid Society contacted Homer Venters and other HHC and DOC personnel to report Patrick's missed chemotherapy appointment and stating that he was still not receiving proper, aggressive treatment for his cancer.

- On September 6, 2016 Patrick was not taken to a scheduled treatment session because the Correctional Officers falsely told him he had been scheduled for the wrong date.

- On October 15, 2016, Rikers Correctional Officers failed to take Patrick to a scheduled chemotherapy treatment session without providing a reason.

In addition, on at least two occasions Patrick was unable to be treated as a result of psychotic episodes and was brought back following disruptive behavior of which the Correctional Officers

2264302.1

were directly aware, which renders hollow any claim that the Correctional Officers were unaware of Patrick's mental condition.

**Patrick's Cancer Progresses and TIP Chemotherapy**

130.  As result of the deliberate indifference of the aforementioned defendants, Patrick's medical condition deteriorated so dramatically that it could no longer be ignored, and Patrick was taken to Bellevue Hospital for further evaluation.  After an examination, Patrick was told that his cancer had spread, and two additional five-day cycles of particularly intensive chemotherapy known as "TIP" chemotherapy were recommended.

131. Patrick began the TIP chemotherapy in June 2016 as planned, but before the conclusion of the first cycle, Patrick became extremely weak and could not stop vomiting.  Patrick asked for a single day to recuperate, but Bellevue staff, including Dr. Nowitzki, denied Patrick's request despite knowing that the treatment made Patrick violently ill.  Patrick reported this to his mother who had accompanied him to the hospital.

132.  On July 6, 2016, Patrick complained to Dr. Maungoo and/or Dr. Win that his stomach pain had intensified.  Patrick also told his mother of his intensifying stomach pain. The previous week Patrick had been given a blood test that indicated his cancer had possibly spread to his liver.

133.  On July 7, 2016, Patrick was given an abdominal CAT scan. However, Dr. Maungoo and/or Dr. Win and/or John Doe 18 failed to order or administer an appropriate contrast solution, and failed to properly advise Patrick to abstain from eating before the CAT scan.  Consequently, the results of the CAT scan were inconclusive and failed to detect the extent of Patrick's cancer. Despite the need to perform the test anew, Dr. Maungoo and/or Dr. Win and/or John Doe 18 failed to order a new CAT scan with contrast, delaying a test which would have evaluated the progress of Patrick's cancer, which at this point had metastasized and spread to his liver.

134.  On July 14, 2016, The Legal Aid Society on behalf of Patrick contacted the HHC and requested an additional CAT scan after explaining that the CAT scan had been improperly administered.  HHC refused to cause a new CAT to be administered.

135.  On July 21, 2016, Patrick was taken to begin his second cycle of TIP chemotherapy. At the hospital, as he was being prepared for chemotherapy, Patrick complained to the attending nurse, John Doe 19, that he/she was attempting to insert the chemotherapy drip into the wrong location on his arm, which terrified him. Rather than addressing Patrick's legitimate fear and anxiety and seeking appropriate psychiatric intervention for Patrick, the attending nurse became extremely agitated and falsely reported that Patrick was belligerent and was refusing treatment, as a result of which Patrick was immediately discharged on the false pretext that Patrick had "refused" treatment. At no time was Patrick fully informed about the possible implications of refusing treatment. Although Patrick's prior medical history left no doubt that he was severely mentally ill, on information and belief, the attending physician, Dr. Aaron Stern, and/or John Doe 20, made no attempt to examine Patrick or make an appropriate psychiatric referral to enable him to continue the scheduled TIP chemotherapy.

136.  On information and belief, though Dr. Maungoo and/or Dr. Win knew or should have known that Patrick was severely mentally ill and that proper treatment of his psychiatric condition might enable him to continue with his cancer treatment, they recklessly and with deliberate indifference to Patrick's medical needs failed to make a mental health referral following his return from Bellevue, failed to make any effort to reschedule Patrick's chemotherapy, and failed to fully inform Patrick about the possible implications of refusing treatment. Dr. Maungoo and/or Dr. Win also failed to prescribe necessary medication to treat Patrick's psychiatric disorders.

137.   On information and belief, the DOC, acting jointly with the City of New York, routinely fails to fully inform prisoners about the possible implications of refusing treatment, and routinely fail to make mental health referrals or to request specialized housing for mentally ill detainees who refuse treatment. On information and belief, treating physicians at Bellevue Hospital and Elmhurst Hospital are aware that prison policies and practices constitute a deviation from accepted medical practice, but nonetheless condone and/or turn a blind eye to DOC practices notwithstanding their violation of accepted standards of medical practice.

**Efforts Made to Secure Proper Treatment or Compassionate Release**

138.   At this point, Patrick's family sought to enlist the assistance of public figures so that Patrick could obtain necessary life-saving treatment.

139.   On July 22, 2016, the Legal Aid Society sent an email to Dr. Homer Venters of New York City Health and Hospitals requesting, inter alia, that Patrick be considered for compassionate release.

140.   Also, on July 22, 2016, Linda Rosenthal, the Assembly member of the 67th Assembly District in New York City, wrote to Commissioner Ponte and informed the Commissioner that Patrick's cancer had spread to his liver and that the "urgency of his treatment is immense."

141.   The DOC and HHC were thus all on notice that Patrick's cancer had spread and that his treatment was a matter of extreme urgency.  However, the DOC and HHC ignored the pleas from the Legal Aid Society and Congresswoman Rosenthal.

142.   On July 25, 2016, Patrick called his father and complained about severe abdominal pain. The Legal Aid Society, on behalf of Patrick's father, requested that representatives of HHC take Patrick to the hospital for proper treatment. HHC ignored this request.

143. On July 26, 2016, Patrick complained to Dr. Maungoo and/or Dr. Win about severe abdominal pain.

144. Further, Patrick told Dr. Maungoo and/or Dr. Win of his desire to pursue chemotherapy and denied that he had refused treatment.

145. In or about the end of July 2016, Patrick lost his hearing. Patrick reported his hearing loss to Dr. Maungoo and/or Dr. Win, but Dr. Maungoo and/or Dr. Win recklessly and with deliberate indifference to Patrick's medical needs ignored this very serious health issue.

146. Patrick's pain was so unbearable that he required a wheelchair for transport to court; yet, even though medical transport was requested for a July 28 court appearance, the DOC staff told him none had been arranged.

147. On September 20, 2016, Patrick contacted HHC directly and reported that he continued to experience severe abdominal pain, but that doctors Dr. Maungoo and/or Dr. Win feared his cancer had spread and that without proper medical treatment he would die.

148. Further, Patrick reported to the office of the Legal Aid Society that since September 13, 2016, Dr. Maungoo and/or Dr. Win had ignored the need to refer Patrick to a qualified practitioner for diagnosis and treatment of his pain.

149. Dr. Maungoo and/or Dr. Win recklessly and with deliberate indifference to Patrick's medical needs ignored Patrick's severe abdominal pain and further deviated from accepted medical standards of care in failing to refer Patrick to a qualified specialist.

150. On information and belief, in addition, Dr. Maungoo and/or Dr. Win and/or John Doe 20 recklessly and with deliberate indifference to Patrick's medical needs failed to provide Patrick medications prescribed by mental health staff to treat his mental illness

151. On September 20, 2016, the Legal Aid Society requested that Patrick be provided with an opportunity to see an outside doctor regarding the progression of his cancer since the

HHC doctors were unqualified or unwilling to address Patrick's abdominal pain and complaints about blood in his stool.

152.  On September 21, 2016, Patrick was taken to Bellevue Hospital as a pretext for treatment, but Patrick was not seen by any doctors. Patrick was not given any reason for this and was not provided with an appropriate psychiatric evaluation. On information and belief, Dr. Maungoo and/or Dr. Win and/or John Doe 20 were attempting to build a false record that Patrick was refusing treatment, when in fact he was being deliberately denied such treatment. At the end of the day, Patrick was taken back to the West Facility on Rikers Island and prescribed Percocet to sedate him.

153.  On September 27, 2016, Patrick was taken to Bellevue Hospital for a second round of chemotherapy.  Patrick was classified as "code red" keep separate status that prohibited him from having any contact with other civilians or prisoners and was taken to the hospital handcuffed and in a wheelchair.  Officer Reyes, the correctional officer who had accompanied Patrick, was aware of Patrick's "code red" keep separate status, but once Patrick arrived at Bellevue, Officer Reyes ignored the "code red" keep separate status and DOC's keep separate policy and proceeded to place Patrick in the same room with an unrestrained prisoner who could walk around freely in the hospital room.

154.  Patrick informed Officer Reyes that he was required to be segregated from other prisoners as a result of his "code red" keep separate status.  Given the past attacks on him by gang members, his acute medical condition, and his untreated mental illness, Patrick told Officer Reyes that he feared for his life and that he was terrified of being alone in a room with an unrestrained prisoner, given that he would be in handcuffs and unable to protect himself.

155.  Officer Reyes ignored Patrick's keep-separate classification as well as Patrick's concerns and instead attempted to force Patrick into the room, to which Patrick verbally protested.

2264302.1

Then, instead of complying with DOC's keep-separate policy, or initiating DOC policy for treating a mentally ill prisoner, Officer Reyes ignored DOC policy and called additional security personnel who physically restrained Patrick and forcibly removed him from the hospital before Patrick could be seen by medical staff. At no time was Patrick provided with medically necessary psychiatric care and evaluation that could have stabilized his condition and enabled him to receive his chemotherapy treatment protocol. In fact, on information and belief, DOC's written policies are a sham, are routinely and systematically ignored and not enforced.

156.  On information and belief, and based on at least the psychotic episode he had personally witnessed and confronted, Officer Reyes knew or should have known that Patrick was severely mentally ill and that proper treatment of his psychiatric condition might enable him to continue with his cancer treatment, and yet Officer Reyes recklessly and with deliberate indifference to Patrick's medical needs failed to make a mental health referral when Patrick was at Bellevue and disregarded established DOC policy for making a mental health referral following Patrick's return from Bellevue.

157.  Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik also knew or should have known that Patrick was severely mentally ill and further knew that hospital policy required a mental health referral in a case where a mentally ill patient purportedly declines treatment, and yet they failed to provide Patrick with an appropriate psychiatric referral to ensure that Patrick gave informed consent when he was discharged without completing his chemotherapy.

158.  Instead, Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik and Bellevue Hospital declared that they would refuse all further treatment of Patrick and ordered that his care be transferred to Elmhurst Hospital.

159.   On October 3, 2016, Patrick filed a grievance with HHC and DOC.

**October 20th, 2016 Assault on Patrick**

160.   On or about October 20, 2016, John Does 21-26 brutally and viciously physically assaulted Patrick. This assault, which was unprovoked, is referred to hereafter as the "October 20 Assault." John Does 21-26 punched and kicked Patrick – at this point a tiny, frail, mentally-ill man suffering from Stage 3 cancer – in the stomach and slammed him on the concrete floor, risking Patrick's life and causing serious injuries to his stomach, back and neck. Patrick was so badly beaten he could not get up or move and had to be rushed to Elmhurst Hospital for emergency medical treatment where he was found to have suffered from traumatic retroperitoneal bleeding of the abdomen.

161.   On information and belief, it is the pattern and practice of DOC correctional officers to systematically use excessive force against prisoners who complain of their treatment or are singled out as "difficult" or "non-cooperative" beyond any need for the use of such force on security grounds.

162.   On information and belief, following the October 20 Assault, the DOC and John Does 21-26 engaged in activities that were designed to cover-up the assault by creating a false record of the incident and by disallowing Patrick all visitation in an effort to restrict Patrick's ability to show his injuries to visitors.

163.   Neither DOC personnel nor the police informed Patrick's family of the October 20 Assault or that Patrick had been hospitalized. It was only when Plaintiff contacted Elmhurst Hospital in a desperate attempt to locate her son that she was told that he had been hospitalized and learned what had transpired.

**<ins>Discovery of Internal Bleeding and Failure to Treat</ins>**

164.   On or about October 20, 2016, Patrick's attending physician at Elmhurst, Dr. Aaron Stern, discovered that Patrick suffered a penetrating injury from the October 20 Assault causing internal bleeding in the retroperitoneal region.

165. Despite the unmistakable evidence of Patrick's visceral injury accompanied by internal retroperitoneal bleeding, and despite the need for an exploratory laparotomy to repair the damage, Dr. Stern failed to perform an exploratory laparotomy to treat Patrick's internal bleeding and instead discharged Patrick back to Rikers Island still bleeding internally, all of which contributed to Patrick's untimely death, as further described below.

**Further TIP Chemotherapy**

166. On November 4, 2016, Patrick finally began his second five-day cycle of TIP chemotherapy. At this point, with the progression of his cancer after the unconscionable delays in treatment and following the violent abuse to which he had been subjected, Patrick was even weaker and frailer than he had been in July.

167. During the second TIP cycle, Patrick again suffered from severe nausea and an inability to tolerate the hospital food that was completely unsuited to the diet needed to sustain a highly invasive and debilitating chemotherapy treatment. Patrick requested a day to recuperate but was again met by the DOC's iron-clad policy that prisoners are not entitled to any rest or recuperation.

168. In addition, despite Patrick's mental issues, severe depression and clinical anxiety, the attending physician, Dr. Roopalekha Shenoy failed to provide Patrick with an appropriate mental health referral to ensure that Patrick received appropriate psychiatric care, evaluation and medication to assist Patrick with the highly invasive TIP chemotherapy regime and/or to ensure that any decisions made by Patrick with respect to his treatment were the result of informed consent.

169. In addition, on information and belief, the Elmhurst tumor board incorrectly concluded that the increase in tumor markers Patrick exhibited were due to his non-compliance

and refusal to be admitted, ignoring the psychiatric, mental, nutritional and institutional reasons Patrick had been unable to complete the earlier five-day chemotherapy regimes.

170. As a result of the foregoing, Patrick was discharged without completing the fifth day of the TIP cycle and without having given informed consent for the interruption of his treatment. In fact, throughout his treatment at Elmhurst, Patrick was not provided with adequate psychiatric medication and evaluation and his repeated discharges following an interruption of treatment was not based on informed consent.

171. The DOC further subjected Patrick to cruel and inhumane treatment in imposing a policy that prevented Patrick from having a short period of recuperation to be able to complete the full five-day cycle of chemotherapy.

172. Following his second round of TIP chemotherapy, Patrick filed a motion for compassionate release that was denied. .

173. In February 2017, Patrick was treated with a third cycle of TIP chemotherapy. Patrick had been chronically and severely malnourished for months and his BMI continued to be dangerously low. Dr. Shenoy failed to provide Patrick with an appropriate mental health referral to ensure that Patrick received appropriate psychiatric care, evaluation, nutrition, medication, and time for recuperation to assist Patrick with the TIP chemotherapy regime and/or to ensure that any decisions made by Patrick with respect to his treatment were the result of informed consent. As a result, through no fault of his own, Patrick was unable to complete all five days of the scheduled chemotherapy.

174. On March 8, 2017, Patrick was admitted to Elmhurst for his fourth cycle of TIP chemotherapy. Still dangerously malnourished, Patrick struggled to endure the chemotherapy, but after two days of treatment his body could not tolerate the medication. Patrick reported that he

was unable to eat the hospital food and that without adequate nourishment he would be unable to continue with chemotherapy.

175. Dr. Shenoy failed to provide Patrick with a mental health referral to ensure that Patrick received psychiatric assistance, evaluation and medication appropriate for a severely mentally ill patient, thereby failing to ensure that any interruption of Patrick's treatment was the result of informed consent. Instead, Dr. Shenoy made an ill-informed decision to discharge Patrick even though he had not completed the full TIP chemotherapy cycle.

176. After his discharge from Elmhurst, Patrick again reported to Dr. Maungoo and/or Dr. Win that he had blood in his stool and was experiencing such severe back pain that his hands and body trembled and shook. Dr. Maungoo and/or Dr. Win knew that Patrick had previously complained of bloody stools and that his complaint of severe back pain, trembling hands and body, combined with new reports of blood in his stools was an indication that Patrick had a serious medical condition that required immediate medical diagnosis and treatment, and yet Dr. Maungoo and/or Dr. Win recklessly failed to conduct appropriate testing to determine the cause of the bleeding, and further failed to make a referral so that Patrick's condition could be appropriately diagnosed and treated, all of which delayed appropriate and diagnosis and treatment of the internal bleeding that caused Patrick's untimely death.

177. Patrick reported to Plaintiff that Dr. Maungoo and/or Dr. Win had ignored Patrick's complaints of blood in his stool and his severe back pain.

178. On or about March 19, 2017, fearing that Patrick was on the verge of death, Plaintiff called an ambulance for her son, but the ambulance was turned away by John Doe 27 who told the paramedics that no detainee named Patrick Fleming was housed on Rikers Island. Following Patrick's attempt to seek emergency medical treatment, the utterly outrageous abuse to which he

was subjected continued.   After this ordeal was over, but still under the shock of this trauma, Patrick called his mother and described in detail what had happened.

**PATRICK'S RELEASE FROM RIKERS ISLAND**

179.   Patrick's condition continued to deteriorate sharply. The charges against Patrick, for which he had been incarcerated for over five years without a trial, following an improper lineup and an attempt to coerce a confession, were now over six years old.   Suddenly, after having previously insisted on a 15-year plea, the prosecution abruptly reversed course and sought to wash its hands of Patrick by offering him a five-year plea deal, perhaps fearing that Patrick would die on Rikers Island and create a political and administrative scandal.   As a result, Patrick plead guilty to a crime he had never committed and for which he maintained his innocence so that he could pursue life-saving medical treatment outside the confines of the criminal justice system.

180.   Patrick's case was scheduled to be heard in court on May 17, 2017, and a writ was issued to the DOC to produce Patrick for the hearing.

181.   On information and belief, John Doe 29 was responsible for the DOC's court transportation unit at Rikers.   On information and belief, John Doe 29 was aware that Patrick had a scheduled hearing on May 17, 2017, and further knew that Patrick had a serious medical condition and disability that required a wheelchair to accommodate his condition in order to transport Patrick to the hearing.   Despite this knowledge, John Doe 29 refused to provide a wheelchair to transport Patrick to his hearing.   As result, Patrick was unable to attend the hearing and the hearing had to be canceled.

182.   By refusing to provide a wheelchair so Patrick could attend the May 17, 2017 hearing, John Doe 29 acted in bad faith to prevent Patrick from attending a hearing that could lead to his release, in reckless disregard of Patrick's life and condition.

2264302.1

183.   On May 25, 2017, Patrick finally appeared in court to plead guilty so he could obtain the vital medical care that had been denied him in jail.  Visibly wobbling, dazed from opioid and other medication, crying out in agony from excruciating abdominal pain, wearing a mask, wrapped in tight clothing to prevent him from falling out of his wheelchair, and without any true knowledge of what he was saying or doing, Patrick plead guilty to an alleged armed robbery even though he was innocent so that he could be released from jail on a five-year sentence for time served to obtain vital medical treatment.  By the following day, Patrick could no longer talk and appeared barely conscious, constantly crying out in agony and pointing to his visibly bloated stomach.

184.   By the time Patrick was taken to Elmhurst Hospital by ambulance, accompanied by Plaintiff, Patrick was on the verge of death. Despite Patrick's constant pointing to his visibly bloated stomach, his history of reporting blood in his stool, and the previous discovery of retroperitoneal bleeding, Drs. Stern and Shenoy failed to conduct adequate tests to determine whether Patrick might be suffering from critical internal bleeding that would require immediate surgery and a blood transfusion to save his life.  It is commonly known that internal bleeding in and around the liver area, particularly in the peritoneum, can result in a life-threatening emergency and cause irreversible liver and renal failure unless detected and treated in a timely manner.  And yet Drs. Stern and Shenoy failed to act for eight full days to determine the cause of the abdominal pain Patrick was reporting.

185.   Plaintiff attempted to obtain proper medical treatment for Patrick without success. On May 26, 2017, Plaintiff contacted the 311-Help line of the City of New York ("NYC311") and reported that her son Patrick had been having incapacitating stomach pains for the past three weeks, that Patrick had been experiencing such severe abdominal pain that he could not stand or walk and could barely talk to his mother on the telephone, and that the DOC staff and the doctors

39

in the prisoners unit at Elmhurst Hospital were well aware of Patrick's condition but had refused to diagnose Patrick's condition.

186.  Though Drs. Stern and Shenoy believed that they could avoid treating Patrick until he was discharged so he could receive high dose chemotherapy and stem cell transplant surgery at Memorial Sloane Kettering, Drs. Stern and Shenoy utterly failed to properly evaluate and test Patrick for possible internal bleeding, despite clear red flags and the knowledge that such bleeding, if left untreated, could prove fatal.

187.  Finally, on June 3, 2017, _nine_ days after Patrick was admitted to the prisoners unit at Elmhurst Hospital, Patrick received his court discharge papers and was free to seek medical care outside the HHC prison medical system. After a day of arguing with Elmhurst medical staff, Plaintiff finally obtained Patrick's release and rushed him to Mt. Sinai hospital for a second opinion.

188.  At Mt. Sinai, Patrick underwent extensive testing, including a complete metabolic panel, a CT abdominal scan with contrast solution, an abdominal X-Ray, and a CT scan with 3-D imaging.  As a result of these and other tests, it was determined that Patrick had been suffering from severe internal bleeding for which a massive transfusion was immediately needed. However, as a result of the delay in diagnosing Patrick's condition, Patrick's condition had deteriorated so dramatically that the transfusion was unable to help prolong and/or save his life. Shortly after the blood transfusion was performed, Patrick's liver and kidney failed, and it was determined that any further treatment would be futile.

189.  Upon learning of Elmhurst's failure to perform adequate testing during the two-week period when Patrick was detained there, one of the senior treating physicians told Ms. Fleming that Patrick's care at Elmhurst had been a "disgrace."

190.   Drs. Stern and Shenoy deviated from the accepted standards of medical practice and caused Patrick's condition to go undiagnosed for nearly two weeks—an eternity for a patient suffering from massive internal bleeding which is both immediately life threatening and can irreparably harm internal organs. But for the failure of Drs. Stern and Shenoy to perform the tests and administer the blood transfusion that accepted medical practice required, Patrick's life would have been saved and/or prolonged, he would have been able to fight or treat his cancer, and he would have been spared intense conscious pain and suffering.

191.   Following the inability of the blood transfusion to stabilize Patrick's condition and the failure of his internal organs, the medical staff at Mt. Sinai concluded that further surgery or medical intervention would be ineffective and that Patrick should be transferred to hospice care.

192.   On June 15, 2015 Patrick was transferred to the hospice unit at Mt. Sinai.

193.   On June 20, 2017, Patrick died, with Plaintiff at his side.

194.   For nearly three months after Patrick's death, Plaintiff was so totally overcome with severe emotional distress and grief that she was unable to function properly in society. It was only after the grieving process had subsided that Plaintiff could consider the legal consequences of the actions and omissions that had so devastated Patrick Fleming.

**THE WIDESPREAD AND SYSTEMATIC NATURE OF PHYSICAL ABUSE AND MEDICAL NEGLECT ON RIKERS ISLAND**

195.   Patrick's tragedy exemplifies the systemic nature of the physical abuse and medical neglect on Rikers Island. This abuse and neglect is so widespread, so systemic and has been condoned for so long that it constitutes a "pattern and practice" violating the U.S. Constitution under *Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 701 (1978). The evidence is overwhelming.

2264302.1

196.   On August 4, 2014, the United States Attorney for the Southern District of New York issued a report (the "DOJ Report") on a detailed civil rights investigation of treatment of adolescent inmates at Rikers Island covering the period 2011 through 2013.[1] The Report is addressed to Mayor Bill DeBlasio, Commissioner Joseph Ponte, and Corporation Counsel Zachary Carter. It concludes  "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates," stating that adolescent inmates are "not adequately protected from harm, including serious physical harm from the rampant use of unnecessary and excessive force by DOC staff" and further concludes that "adolescents are not adequately protected from harm caused by violence inflicted by other inmates," DOJ Report at 3.

197.   The Report details numerous specific instances of "excessive and unnecessary force. . .against adolescent inmates," including frequent resort to blows to an inmate's head, force used as punishment or retribution, force used in response to inmates' verbal altercations with officers, and more frequent uses of force in areas without video surveillance. DOJ Report at 4.

198.   The Report identifies systemic deficiencies largely responsible for the unnecessary and excessive use of force, including false reporting by staff, inadequate staff discipline for inappropriate use of force, inadequate supervision of inmates by staff, inadequate investigations into the use of force, and general failures by management to adequately address "the extraordinarily high levels of violence perpetrated against and among the adolescent population."  It also finds that "the use of prolonged punitive segregation for adolescent inmates is excessive and inappropriate."   DOJ Report at 4.

---

[1] https://www.documentcloud.org/documents/1240461-department-of-justice-letter-about-rikers-island.html

199.   The Report states that the focus on the adolescent population "should not be interpreted as an exoneration of DOC practices in the jails housing adult inmates." Rather, it stresses that while it "did not specifically investigate the use of force against adult inmates," its "investigation suggests that the systematic deficiencies identified in this report may exist in equal measure at the other jails on Rikers." DOJ Report at 3.

200.   The Report details numerous egregious instances of excessive force against adolescent inmates, including the following incidents:

-- An inmate reported that he was punched and stomped on by several officers in a school corridor after verbally insulting one of them during an argument;

-- In August 2013, four adolescent inmates were reportedly brutally beaten by multiple officers. . .punching and kicking them and striking them with radios, batons, and broomsticks. . .The inmates sustained multiple injuries, including a broken nose, a perforated eardrum, head trauma, chest contusions and injuries to the head and facial area.

-- In January 2013, after reportedly being disruptive. . .an inmate, who was on suicide watch at the time, was taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground covering his head with his hands.

-- In January 2014, in connection with an investigation of a missing pen, an inmate reported that he was repeatedly punched and kicked in the head and face by multiple officers. The inmate was still spitting up blood and having difficulty talking when Board of Correction staff interviewed him hours after the incident.

43

201.   The treatment Patrick received at the hands of DOC correctional officials during his confinement supports the suggestion in the DOJ report that the "systematic deficiencies identified in this Report may exist in equal measure at the other jails on Rikers." As set forth herein, over a period of two years, from 2015 to 2016, Patrick was subjected to brutal assaults by force on three different occasions, twice in 2015 and once in 2016.

202.   After the June 8 assault, as alleged above, the Legal Aid Society notified multiple DOC, DOI, and BOC staff and officials of the occurrence and seeking a credible investigation. The Legal Aid Society also notified responsible officials of misconduct directed at two other inmates, as described above.

203.   Yet, despite notice to presumably responsible officials, Patrick was again assaulted on August 2015. This assault caused him incalculable harm, requiring him to undergo an oriechtomy under conditions of trauma and bleeding that may have interfered with the accurate staging of his testicular cancer. Once again, the Legal Aid Society notified multiple DOC, DOI, and BOC staff and officials of the assault with a request for a credible investigation. Once again, the Legal Aid Society reported allegations of additional misconduct, bringing forward the claims of four other inmates, as described above.

204.   Despite this, DOC correctional officers were not called to account for the damage done to Patrick. Indeed, over the months that followed, even though the Legal Aid Society sent dozens of requests to DOC officials and staff requesting that Patrick receive protective custody and/or housing appropriate to his medical condition, Patrick continued to be in harm's way. In October 2016, he was assaulted once again.

205.   Patrick's experience of brutalization at the hands of DOC correctional officers is not an isolated incident. To the contrary, there is abundant evidence in the public record that during the period of his confinement numerous other Rikers adult pretrial detainees and/or

44

inmates were brutalized at Rikers pursuant to a culture of violence so widespread that it amounted to an unconstitutional custom or usage for which the City of New York bears legal responsibility.

206.    In March 2014, according to an AP News Report, Jerome Murdough, a homeless veteran in Rikers on an accusation of trespassing, was found dead in his cell from overexposure to heat. He took anti-psychotic and anti-seizure medications and was not checked for hours.[2] The news story reports that Department of Correction Acting Commissioner Mark Cranston issued a statement calling Murdough's death "unfortunate" and stating that an internal investigation will look into the entire episode, "including issues of staff performance and the adequacy of procedures.

207.    In May 2014, the *New York Daily News* reported that a mentally ill inmate named Bradley Ballard, age 39, died a horrible death on Rikers after he languished in a jail cell for seven days.[3] When correction officers finally came to his aid, Ballard, an African-American inmate, was naked, unresponsive, and covered in feces. His genitals were swollen and infected, injuries he suffered after he tied a band around his penis. According to the *Daily News* story, Ballard suffered from schizophrenia and diabetes, and his death raised questions about the City's treatment of mentally ill inmates. Commissioner Ponte was quoted as saying his agency "must do better by inmates who suffer from mental health issues."

208.   According to a July 2014 *New York Times* story by Michael Winerip and Michael Schwirtz, some 129 inmates, 77% of who were diagnosed as mentally ill, suffered "serious

---

[2] Pearson, Jake, "NYC Inmate 'Baked to Death in Cell'", AP News.
https://news.yahoo.com/apnewsbreak-nyc-inmate-baked-death-cell-153720084.html
[3] "Mentally ill Rikers Island Inmate Dies After Languishing in Jail for 7 Days," *New York Daily News,* 22 May 2014, https://www.nydailynews.com/new-york/nyc-crime/rikers-island-inmate-dies-7-days-cell-report-article-1.1801606

injuries in altercations with prison guards over an 11-month period in 2013," injuries that were

beyond the capacity of prison doctors to treat successfully.[4]  The news story stated:

> Reports of such abuses have seldom reached the outside world, even as alarm has grown this year over conditions at the sprawling jail complex. A dearth of whistle-blowers, coupled with the reluctance of the city's Department of Correction to acknowledge the problem and the fact that guards are rarely punished, has kept the full extent of the violence hidden from public view.

209.   But the *New York Times* uncovered details on scores of assaults through interviews

with current and former inmates, correction officers and mental health clinicians at the jail, and

by reviewing hundreds of pages of legal, investigative and jail records.

210.   The *New York Times* reporters relied in in part on a "secret internal study

completed [in 2014] by the city's Department of Health and Mental Hygiene, which handles

medical care at Rikers, on violence by officers. The *Times* story states that this study "helps lay

bare the culture of brutality on the island and makes clear that it is inmates with mental illnesses

who absorb the overwhelming brunt of the violence."

211.   In February 2015, reporters Winerip and Schwirtz followed up with a *New York

Times* story stating that brutality at Rikers persisted despite the recent public attention.[5] They

described three incidents—the severe beating of a mentally ill inmate Jose Guadalupe while he

was in a solitary confinement cell, the brutalization of inmate Tracy Johnson that resulted in a

broken bone in his eye socket, and the severe beating by a group of officers of Ambiorix

Celedonia.  The story stated that these cases were "among 62 cases identified by the New York

---

[4] Michael Winerip and Michael Schwirtz (July 14, 2014), *Rikers: Where Mental Illness Meets Brutality in Jail. The New York Times.*  https://www.nytimes.com/2014/07/14/nyregion/rikers-study-finds-prisoners-injured-by-employees.html

[5] Michael Winerip and Michael Schwirtz, *Even As Many Eyes Watch Brutality at Rikers Island Persists, New York Times* https://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html

Times in which inmates were seriously injured by correction officers between last August and January, a period when city and federal officials had become increasingly focused on reining in violence at Rikers." According to DOC data, the story recounted that "guards used physical force against inmates 4,074 times in 2014, the highest total in more than a decade." The reporters stated that they based their findings "on a review of hundreds of pages of Correction Department reports detailing the most serious uses of physical force by correction officers, city records describing inmate injuries, internal city investigative documents and inmate medical records."

212. Officials at the highest levels of the Department of Corrections, including Commissioner Joseph Ponte, knew of the culture of excessive force and violence on Rikers Island and knew of the serious deficiencies in the care of mentally ill inmates.[6] Indeed, the *New York Daily News* in a June 2, 2014 story on continued widespread violence and abuse of the mentally ill at Rikers, quoted Commissioner Ponte as stating: "It's kind of the definition of insanity when we continue to do the same things over and over and have the same outcome."[7]

213. Over the years spanning 2014-2017, the City of New York has been named as a defendant in cases involving Rikers hundreds of times as is evidenced by an estimate of filings in the ECF PACER system.

214. These facts evince a systemic, institutional pattern and practice of routinized violence at Rikers constituting a widespread practice that, although not authorized by written

---

[6] *See* November 18, 2014 Minutes of the Department of Corrections Board of Directors, available at
https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/bocminutes_11_18_14.pdf.;
Oversight Hearing- Examining Violence in New York City Jails compiled by the Urban Justice Center (attached to the Board Minutes).
[7] Erin Durkin, City's New Jail Boss Says His Department is in 'Deep Trouble', N.Y. Daily News (June 2, 2014), https://www.nydailynews.com/new-york/jail-boss-department-mess-article-1.1814744

law or express municipal policy, is so permanent or well-settled as to constitute a custom or usage.

215.   Alternatively, they evince a failure to train or supervise employees to a degree that evinces a "deliberate indifference" to the rights of pre-trial detainees and inmates in the custody of the municipality.

216.   These facts further show that the City of New York was aware of the culture of extreme violence at Rikers, aware detainees and inmates received woefully inadequate medical care, aware that mentally ill detainees and inmates were particularly susceptible to grievous harm in that environment, aware of the problems of training and supervising Rikers Island employees—and yet did nothing.

217.   The multi-year pattern of violence to which Patrick was subjected and the credible reports of misconduct by numerous other officers raises a plausible inference that the custom and usage of excessive force described and documented by so many different sources was alive and well during the 2015-2017 timeframe when Patrick suffered the abuse set forth herein. Likewise, it can be inferred that the particular acts of violence directed at Patrick were enabled by this custom and usage and resulted in grievous harm to him.

## FIRST CAUSE OF ACTION

**Deprivation of Fourth, and Fourteenth Amendment Rights,**
**42 U.S.C. § 1983**

**(Against Correctional Officers Blake, Saint-Fleur, Owens, Rolle, Ward,**
**Whitaker, Wisti and Williams and Correctional Officers John Does 1-14**
**and 21-29, Dr. Maungoo, Dr. Win, Dr. Martinez and Rikers Island Medical Staff John**
**Does 15-20)**

218.   Plaintiff repeats and realleges each and every foregoing allegation if as if fully set forth herein.

48

219.   Defendants Captain Desmond Blake, Captain Johanne Saint-Fleur, Correctional Officer Timothy Owens, Correctional Officer Fred Rolle, Correctional Officer Jorel Ward, Correctional Officer David Whitaker, Correctional Officer John Wisti, Correctional Officer Williams  and Correctional Officers John Does 1-14 and 21-29, Drs. Maungoo, Dr. Win, Dr. Martinez, and Rikers Island medical staff John Does 15-20 (the "§ 1983 Individual  Defendants"), are liable  for their respective actions, omissions,  failure to supervise, supervision or supervisory directives  as set forth herein (it being understood that Dr. Maungoo, Dr. Win, Dr. Martinez and Rikers Island Medical Staff John Does 15-20 are not liable  for (a) and (b) below),  including

(a) attacking and/or causing Patrick to be subjected to and/or condoning  brutal, violent and unconscionable  physical attacks and excessive force, during  the June 8, August 16 and October 20 Assaults;

(b) causing Patrick  to be unconscionably  placed in solitary  confinement  and denied adequate medical care, and deprived of adequate nutrition  and water, even though they knew or should have known he was suffering  from at least Stage 2 cancer at the time of this punitive  confinement;

(c) deliberately  ignoring  Patrick's allergies,  restrictions  on the liquids  he was able to consume,  dietary needs, and needs as a cancer patient for food he could tolerate;

(d) failing  to make an appropriate  mental health referrals; and

thereby depriving  Patrick of his constitutional  rights to personal security,  physical integrity  and privacy,  procedural and substantive  due process under the Fourth, and Fourteenth Amendments to the Constitution  of the United States.

220.  At all times relevant herein, § 1983 Individual  Defendants were acting under color of the law of the State of New York.

221.   The conduct by the § 1983 Individual Defendants constituted deliberate and outrageous indifference to Patrick's constitutional rights and the § 1983 Individual Defendants abused their authority by acting with deliberate indifference to, and with reckless, willful and callous disregard for, the known substantial risk of injury to Patrick, in deprivation of his constitutional rights.

222.   As a direct and proximate result of the foregoing deliberate indifference on the part of § 1983 Individual Defendants acting under color of the law of the State of New York, Patrick suffered serious physical, mental, psychological and emotional injury, including pain and suffering and death.

223.   For the foregoing deprivations of Patrick's constitutional rights under color of law, the § 1983 Individual Defendants are liable in their individual capacities for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1983 and § 1988.

## SECOND CAUSE OF ACTION

### Violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.

### (Against the City of New York)

224.   Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

225.   Patrick was disabled mentally and was also disabled physically as a result of his cancer and other infirmities.

226.   At all times herein, Patrick was qualified to participate in the programs, services and activities provided by the City of New York and DOC, the City of New York discriminated against Patrick because of his disabilities by:

50

- failing to make appropriate housing available to accommodate his mental and medical disabilities;

- failing to provide wheelchair accessible medical transport so he could attend a court hearing on June 28, 2016; and

- failing to provide a wheelchair to accommodate his medical disability so he could access the courts to attend his hearing on May 17, 2017.

227. For the foregoing deprivations of Patrick's rights under Title II of the Americans with Disabilities Act, the City of New York is liable for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### Violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)

### (Against the City of New York)

228. Plaintiffs repeat and re-allege each and every foregoing allegation in paragraphs as if fully set forth herein.

229. On information and belief, the City of New York receives federal financial assistance.

230. Patrick was disabled mentally and was also disabled physically as a result of his cancer and other infirmities.

231. At all times herein, Patrick was qualified to participate in the programs, services and activities provided by the City of New York.

232. Defendants the City of New York discriminated against Patrick because of his disabilities by:

51

233. failing to make appropriate housing available to accommodate his mental and medical disabilities;

234. failing to provide wheelchair accessible medical transport so he could attend a court hearing on June 28, 2016; and

235. failing to provide a wheelchair to accommodate his medical disability so he could access the courts to attend his hearing.

236. For the foregoing deprivations of Patrick's rights under Section 504 of the Rehabilitation Act of 1973, the City of New York is liable for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Assault and Battery
### (Against Defendants Correctional Officers, John Does 1-6 and 21-26, in their individual and official capacity)

237. Plaintiffs repeat and re-allege each and every foregoing allegation as if fully set forth herein.

238. On October 20, 2016, Defendants Correctional Officers, John Does 1-6 and 21-26 intentionally placed Patrick in fear of imminent harmful or offensive contact and committed intentional wrongful physical contact upon Patrick without consent.

239. As a result of the conduct of Defendants Correctional Officers, John Does 1-6 and 21-26, Patrick suffered severe physical, emotional, mental and psychological damages for which Defendants John Does 1-6 and 21-26 are liable in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Vicarious liability for Assault and Battery
### (Vicarious liability of the City of New York)

240.   Plaintiff repeats and re-alleges each and every foregoing allegation as if fully set forth herein.

241.   John Does 1-6 and 21-16 were acting in their official capacity and within the scope of their authority as Correctional Officers employed by and under the control of the Department of Corrections when they subjected Patrick to the assault and battery described above.

242.   The City of New York is vicariously liable for the actions of Defendants Correctional Officers, John Does 1-6 and 21-16, for the assault and battery described above and are liable for the physical, emotional, mental and psychological damages suffered by Patrick as a result of said assault and battery in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Negligence

**(Defendants Commissioner Ponte, the City of New York, New York City Health and Hospitals Corporation, Corizon, Pagny, Dr. Maungoo, Dr. Win, Dr. Martinez)**

243.   Plaintiff repeats and realleges each and every foregoing allegation as if fully set forth herein.

244.   On information and belief, Defendants Commissioner Ponte, the City of New York, New York City Health and Hospitals Corporation, Corizon, Pagny, (the "Opioid Defendants") prescribed and/or caused to be or failed to prevent from being prescribed excessive quantities of opioid medication (including Percocet) beyond any amounts that were medically required for Patrick's bona fide medical needs and without adequate warnings as to the harmful nature of such medication.

245.   The Opioid Defendants had a duty not to distribute and prescribe opioid medication (including Percocet) to Patrick in such excess quantities as was reasonably foreseeable to cause

53

severe harm to Patrick, and a duty to warn him of the harmful nature of opioid medication for cancer patients.

246. The Opioid Defendants breached their duty to Patrick by prescribing and administering to him excessive quantities of opioid medication (including Percocet) beyond any amounts necessary for his medical treatment, failing to warn him of the harmful and addictive nature of such medication, thereby preventing him from providing informed consent during his cancer treatment, and causing him emotional, psychological and physical harm, including pain and suffering and death, and the Opioid Defendants are liable to Plaintiff for damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Negligence

### (Defendants Rikers Island Correctional Officers, Drs. Maungoo, Win and Martinez and Medical Staff John Does 1-38)

247. Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

248. Defendants John Does 1-38, Correctional Officers and Medical Staff at Rikers Island responsible for supervising Patrick and overseeing his day-to-day physical and medical monitoring and care, and Drs. Maungoo, Win and Martinez, owed duties to Patrick:

- to avoid placing him in squalid, insalubrious living conditions unsuitable for recovery from a life-threatening disease;

- to avoid prescribing highly-addictive opioid medication;

- to listen to his physical and medical complaints, record relevant medical information communicated by Patrick and third parties acting on Patrick's

behalf and transmit relevant information concerning his medical, mental or physical state to competent medical personnel;

- not to minimize and improperly record Patrick's medical and physical safety complaints and concern; and

- to ensure that he would be taken to appointments with competent medical personnel on a regular and timely fashion.

249. John Does 1-38 breached their duties set forth above, failing in each case to take the actions mandated by the duties set forth above.

250. The breaches by John Does 1-38 were the proximate cause of physical, mental, emotional and psychological harm, including pain and suffering and death, to Patrick and therefore Defendants John Does 1-38 are liable for damages in an amount to be determined at trial.

251. The breaches by Drs. Maungoo, Win and Martinez, were the proximate cause of physical, mental, emotional and psychological harm, including pain and suffering and death, to Patrick and therefore Drs. Maungoo, Win and Martinez are liable for damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### Negligence

**(Vicarious liability of Commissioner Ponte, the City of New York, the New York Health and Hospitals Corporation, Corizon and PAGNY)**

252. Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

253.   John Does 1-38, when breaching their duties set forth above, were acting at all times in their official capacities and in the scope of their authority as individuals employed by Commissioner Ponte, the City of New York, Corizon, PAGNY, or HHC, as the case may be.

254.   Each of Corizon, PAGNY and/or HHC, as the case may be, was ultimately under the control of Commissioner Ponte and the City of New York.

255.   Defendants Commissioner Ponte, the City of New York, HHC, Corizon and PAGNY are vicariously liable for the physical, emotional, mental and psychological harm, including pain and suffering and death, proximately caused to Patrick by John Does 1-38 and are liable to Patrick therefore in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### Medical Malpractice

**(Defendants the New York Health and Hospitals Corporation,
Corizon Health, Inc., PAGNY, medical personnel
John Does 15-20 staffed at Rikers Island, Dr. Maungoo, Dr. Win and Dr. Martinez)**

256.   Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

257.   Defendants HHC, Corizon Health, Inc., PAGNY, medical personnel John Does 15-20 staffed at Rikers Island, Dr. Maungoo, Dr. Win, and Dr. Martinez personally and/or by and through their agents and employees, deviated from the accepted standard of medical care applicable to primary care clinics of the type maintained on Rikers Island by failing to properly record and minimizing Patrick's complaints, including those concerning abdominal pain and internal bleeding; failing to provide Patrick with appropriate psychiatric and psychological treatment, including assistance to enable him to confront invasive and debilitating chemotherapy, and provide informed consent to any deviations from treatment protocols; failing to test, evaluate and screen Patrick for internal bleeding; failing to ensure that Patrick would have access to

56

competent doctors outside of the prison complex for treatment and diagnosis as necessary; failing to take or cause Patrick to be taken to scheduled medical appointments at Bellevue and Elmhurst; failing to properly treat Patrick for his Hepatitis B; failing to provide Patrick with sufficient periods of recuperation so that he could withstand the full cycles of chemotherapy; failing to ensure that Patrick's need for adequate nutrition were met; failing to provide Patrick with needed medications, and failing to transmit material information concerning Patrick's medical condition and the concerns expressed by Patrick, including repeated reports of internal bleeding as manifested by Patrick's report of blood in his stool.

258.   As a direct and proximate result of the individual and collective acts and omissions of Defendants HHC, Corizon, PAGNY, medical personnel John Does 15-20 staffed at Rikers Island, Dr. Maungoo, Dr. Win and Dr. Martinez, Patrick's medical condition was aggravated, resulting in the failure to detect and diagnose the metastasis of Patrick's cancer to his liver in a timely manner and the failure to diagnose severe internal bleeding accompanying or resulting in a hemoperitoneum, agonizing conscious pain and suffering, and death.

259.   As a result of their medical malpractice, Defendants HHC, Corizon, PAGNY, medical personnel John Does 15-20 staffed at Rikers Island, Dr. Maungoo, Dr. Win and Dr. Martinez are liable for damages in amount to be determined at trial.

## TENTH CAUSE OF ACTION

### Medical Malpractice

### (Defendants HHC, Dr. Mary Lynn Nierodzik, Dr. Nicole Lanatra, Dr. Jennifer Wu and Bellevue Medical Personnel John Does 17-20 and 30-35)

260.   Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.  At all relevant times herein, Defendant HHC, and its agents, employees and contractors, Bellevue medical personnel, Defendants John Does 17-20 and 30-35, Dr. Mary

57

Lynn Nierodzik ("Dr. Nierodzik"), Dr. Nicole Lanatra ("Dr. Lanatra") and Dr. Jennifer Wu ("Dr. Wu") deviated from the accepted standard of medical practice in failing to provide Patrick with adequate and appropriate psychiatric care, evaluation and/or medication in light of Patrick's known history of mental illness leading to the failure to obtain informed consent from Patrick at critical junctures in his treatment.

261.   As a direct and proximate result of their individual and collective acts Defendants HHC, Bellevue medical personnel John Does 17-20 and 30-35, and Drs. Nierodzik, Lanatra and Wu proximately caused an aggravation of Patrick's condition, the shortening of his life expectancy, unnecessary and agonizing conscious pain and suffering, and death.

262.   As a result of the foregoing, Defendants HHC, Bellevue medical personnel John Does 17-20 and 30-35, and Drs. Nierodzik, Lanatra and Wu are liable for damages in amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Medical Malpractice

### (Defendants Elmhurst Medical Personnel, John Does 17-20 and 30-35, Drs. Shenoy and Stern)

263.   Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

264.   At all times relevant herein, Defendant HHC and its agents, employees and contractors, Drs. Shenoy and Stern, and Elmhurst medical personnel, Defendants John Does 17-20 and 30-35, deviated from the accepted standard of medical practice in failing to detect and treat Patrick's internal bleeding and hemoperitoneum, and failing to provide Patrick with adequate and appropriate psychiatric care, evaluation and/or medication in light of Patrick's known history

of mental illness, leading to the failure to obtain informed consent from Patrick at critical junctures in his treatment.

265. The individual and collective acts and omissions of Defendant HHC, Elmhurst medical personnel John Does 17-20 and 30-35, Drs. Shenoy and Stern directly and proximately caused an aggravation of Patrick's condition, the shortening of his life expectancy, agonizing conscious pain and suffering, and death.

266. As a result of the foregoing, Defendants HHC, Drs. Shenoy and Stern, and Elmhurst medical personnel, John Does 17-20 and 30-35, are liable for damages in amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### Wrongful Death

### (Against all Defendants)

267. Plaintiffs repeat and reallege each and every foregoing allegation as if fully set forth herein.

268. Patrick is deceased.

269. As set forth herein, Patrick's death was proximately caused by the actions of Defendants, each of which contributed to such death by their respective actions in failing or causing the failure to provide appropriate nutrition and psychological counseling and evaluation so that Patrick could complete a course of chemotherapy, failing or causing to fail to record and transmit warning signs and reports of internal bleeding, failing or causing to fail to detect and/or treat internal bleeding, subjecting Patrick to physical abuse and solitary confinement without adequate nutrition and access to medical care.

270. Patrick died intestate and with statutory distributes, including his mother, who survived pecuniary loss by being deprived of the earning power, care and attention of her son.

Patrick had cared for his grandmother before his incarceration and had contributed to the upkeep of the family home as an industrious, dedicated worker maintaining two jobs, and would have been able to continue providing such assistance and contribution to his mother for the remainder of her life.

271.    Plaintiff has been appointed Patrick's personal representative.

272.    As a result of the foregoing, Defendants are jointly and severally liable for damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

### Deprivation of Fourth and Fourteenth Amendment Rights
### (Defendant the City of New York under *Monell v. Dept. of Soc. Servs.*)

273.    Plaintiffs repeat and re-allege each and every foregoing allegation as if fully set forth herein.

274.    This Count is brought against the City of New York under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, as applied by the United States Supreme Court in *Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 701 (1978)), by longstanding customs, policies, and practices of using and condoning or turning a blind eye to the use of excessive force against detainees on Rikers Island, ignoring and systematically failing to enforce DOC guidelines, including those relating to the use of force by correctional officers.

275.    The City of New York expressly or tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

276.   As a result of the foregoing, Patrick suffered severe pain and suffering, mental anguish, emotional distress, economic damages, serious physical injury, and ultimately death, which were a direct and proximate result of New York City's customs, policies, and/or practices.

277.   For the foregoing deprivations of Patrick's rights New York City is liable for compensatory damages, punitive damages, as well as reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1983 and § 1988.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure § 38(b), Plaintiff demands a trial by jury on all counts for which a right to a jury trial exists.

**WHEREFORE**, Plaintiff demands judgment:

(1)   On her First Cause of Action for deprivation of Patrick's Fourth, and Fourteenth Amendment rights against the § 1983 Individual Defendants, for damages in an amount to be determined at trial;

(1)   On her Second Cause of Action for violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. against the City of New York, for damages in an amount to be determined at trial;

(2)   On her Third Cause of Action for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) against the City of New York for damages in an amount to be determined at trial;

(3)   On her Fourth Cause of Action for assault and battery against Defendants Correctional Officers, John Does 1-6 and 21-26, in their individual and official capacity, for damages in an amount to be determined at trial;

(4)     On her Fifth Cause of Action for vicarious liability for assault and battery against the City of New York, for damages in an amount to be determined at trial;

(5)     On her Sixth Cause of Action for negligence against Defendants Commissioner Ponte, the City of New York, New York City Health and Hospitals Corporation, Corizon, PAGNY, Dr. Maungoo, Dr. Win, Dr. Martinez, for damages in an amount to be determined at trial;

(6)     On her Seventh Cause of Action for negligence against Rikers Island Correctional Officers, Medical Staff John Does 1-38, Dr. Maungoo, Dr. Win, and Dr. Martinez for damages in an amount to be determined at trial;

(7)     On her Eighth Cause of Action for vicarious liability for negligence against the City of New York, the New York Health and Hospitals Corporation, Corizon Health, Inc. and PAGNY, for damages in an amount to be determined at trial;

(8)     On her Ninth Cause of Action for medical malpractice against Defendants HHC, Corizon Health, Inc., PAGNY, medical personnel John Does 15-20 staffed at Rikers Island, Dr. Maungoo, Dr. Win and Dr. Martinez, damages in an amount to be determined at trial;

(9)     On her Tenth Cause of Action for medical malpractice against Defendants HHC, Dr. Mary Lynn Nierodzik, Dr. Nicole Lanatra, Dr. Jennifer Wu and Bellevue Medical Personnel John Does 17-20 and 30-35, damages in an amount to be determined at trial;

(10)    On her Eleventh Cause of Action for medical malpractice against HHC, Defendants Elmhurst Medical Personnel, John Does 17-20 and 30-35, Drs. Shenoy and Stern, for damages in an amount to be determined at trial;

62

(11)    On her Twelfth Cause of Action for wrongful death against all Defendants, for

damages in an amount to be determined at trial;

(12)    On her Thirteenth Cause of Action for violations  of Patrick's Fourth

and Fourteenth Amendment rights against the City of New York under *Monell v.*

*Dept. of Soc. Servs.*, for damages in an amount to be determined at trial;

(13)    Punitive damages;

(14)    Reasonable attorneys' fees and costs of the present action; and

(15)    Such other relief as the Court deems just and proper.

Dated:    New York, New York,

October 26, 2020

**DUNNINGTON, BARHTOLOW & MILLER, LLP**
230 Park Ave., 21st Floor
New York, New York 10169
(212) 682-8811
*Attorneys for Plaintiff*
*PATRICIA FLEMING, as Administratrix*
*of the Estate of Patrick Fleming*

By:  */s/ Eden P. Quainton_____*
EDEN P. QUAINTON, ESQ.

2264302.1